**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Daniel S. Guerra (State Bar No. 267559)
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
dguerra@bursor.com
sbogdanovich@bursor.com

*Attorneys for Plaintiff and the Putative Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| VEELEAF, individually and on behalf of all other persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC. and META PLATFORMS IRELAND LIMITED,<br><br>Defendants. | Case No.<br><br><u>CLASS ACTION</u><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Veeleaf ("Plaintiff") files this class action complaint on behalf of itself and all others similarly situated (the "Class Members") against Defendants Meta Platforms, Inc. ("Meta US"), and Meta Platforms Ireland Limited ("Meta Ireland") (collectively, "Meta"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to itself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1. This action challenges Meta's practice of accepting advertisers' payments to distribute sponsored posts while simultaneously undermining the distribution of those same posts, by either removing paid posts on pretextual grounds unsupported by any bona fide violation of Meta's own content rules, and/or by suppressing the delivered reach of the advertiser's paid content (referred to herein as "reach suppression"), so that the advertiser receives only a fraction of the audience it purchased. In so doing, Meta violated its own contractual terms, its implied by law duty of good faith and fair dealing, and California's Unfair Competition Law.

2. Meta US is a California corporation that owns and operates the Facebook and Instagram platforms. According to most recent SEC filings, it "generate[s] substantially all of [its] revenue from selling advertising placements on our family of apps to marketers."[1] Businesses, nonprofit organizations, and other entities pay Meta US to distribute "sponsored posts" (also called "boosted posts" or "ads") to audiences that those advertisers select and pay to reach. Meta Ireland, in turn, provides the "Self-Serve Ad Interfaces" to parties outside of the United States and Canada.

3. When an advertiser places and pays for a sponsored post, it enters into a contract with Meta. In exchange for payment, Meta expressly agrees—through its Self-Serve Ad Terms—that, upon accepting an order, it "will deliver your ads as inventory becomes available" and will use "best efforts to deliver the ads to the audience you specify or to achieve the outcome that you select." *See* Meta Self-Serve Advertising Terms § 1, attached hereto as Exhibit B.

4. "Reach Suppression," sometimes referred to as "Shadowbanning," "Visibility

[1] Meta Platforms, Inc. SEC Form 10-K for fiscal year ended December 31, 2024, https://www.sec.gov/Archives/edgar/data/1326801/000132680125000017/meta-20241231.htm.

Filtering" or "Reduced distribution" refers to the controversial practice of social media platforms reducing the distribution of an account's content—including its paid content—below the level the account would otherwise receive, frequently following a content report or removal.[2]

5. Plaintiff Veeleaf is a nonprofit animal-welfare advocacy organization that operates the Instagram account @veeleaforg. Veeleaf "fights for animal rights," and seeks to "educate the public about veganism to generate critical thinking about all types of animal use and exploitation."[3] At all relevant times, Plaintiff's account had approximately 115,000 followers. Plaintiff received charitable grants earmarked, in part, for the purchase of sponsored posts on Instagram, and used those funds to pay Meta US so Meta Ireland could distribute its advocacy content.

6. On April 19, 2025, Meta US removed two of Plaintiff's sponsored posts. The first was a video documenting a lawful, peaceful protest outside a hotel resort, in which demonstrators held banners reading "Close [the] Dolphin Prison" and told passing motorists "A Day of Fun for You; A Lifetime of Misery for Them"—without ever identifying which of Meta's Community Standards the video purportedly violated.

7. The second post Meta US removed was a video from within that hotel resort, showing a dolphin getting severely injured during a live performance. Following these posts' removal, Meta notified Veeleaf that its account "can't be shown to non-followers," meaning it "won't appear in places like Explore, Search, Suggested Users, Reels, and Feed Recommendations."

8. Following these removals, engagement on Plaintiff's sponsored posts collapsed. Measured against Plaintiff's established pre-removal baseline, the median number of views on Plaintiff's posts fell by approximately 64.9%, and median reach fell by approximately 58.1%. Even so, Meta still gladly accepted payments from Veeleaf to make sponsored posts thereafter, and

---

[2] BRANDWATCH, *Shadowban*, Social Media Glossory, https://www.brandwatch.com/social-media-glossary/shadowban/.

[3] VeeLeaf, About Us, https://veeleaf.org/.

continued to suppress the reach of those sponsored posts from January and February 2026, *after* accepting payment. Meta did not refund Veeleaf after suppressing the reach of any of its posts.

9. On information and belief, Meta has engaged in the same conduct against numerous other advocacy organizations that purchased sponsored posts, removing their paid content on false pretenses and thereafter suppressing the reach of their paid posts.

10. By accepting payment to distribute sponsored posts while simultaneously suppressing the reach of those very same posts or subsequently removing those posts after initially approving them, Meta breached its contracts with Plaintiff and the Class and breached the implied covenant of good faith and fair dealing that inheres in every such contract under California law.

11. Meta's conduct also violates California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, and the Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* Critically, Plaintiff's claims arise from Meta's own promises and its own commercial conduct toward its paying customers—not from the publication of any content created by a third party. Plaintiff does not seek to hold Meta liable as the publisher or speaker of anyone else's content under Section 230 of the Communications Decency Act. Rather, it seeks to receive the benefit of the bargain it struck with Meta and hold Meta accountable for breaking its contractual promises. *See Calise v. Meta Platforms, Inc.*, 103 F.4th 732 (9th Cir. 2024); *Est. of Bride v. Yolo Techs., Inc.*, 112 F.4th 1168 (9th Cir. 2024).

12. Plaintiff brings this action on behalf of itself and a Class of advertisers to recover damages, restitution, and declaratory and injunctive relief.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which the proposed Class contains more than 100 members, the aggregate amount in controversy exceeds $5,000,000

exclusive of interest and costs, and at least one member of the proposed Class is a citizen of a State different from Defendants.

14. This Court has personal jurisdiction over Meta because Meta US maintains its principal place of business in this State and District, conducts substantial business throughout California, and the claims arise out of Meta's California-based conduct. Both Meta US and Meta Ireland have also consented to the jurisdiction of the courts of this District through the forum-selection provision in the Meta Terms of Service and Commercial Terms of Service, attached hereto as Exhibits A and C. Section 4.4 of the Terms of Service provides that "any claim, cause of action, or dispute between us that arises out of or relates to these Terms or your access or use of the Meta Products shall be resolved exclusively in the U.S. District Court for the Northern District of California." And Section 5.d.iii of the Commercial Terms of Service provide that if a litigant like Veeleaf "reside[s]" or "is located outside the United States, you agree that… any Commercial Claim between you and both Meta Platforms, Inc. and Meta Platforms Ireland Limited must be resolved exclusively in the U.S. District Court for the Northern District of California."

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Meta US resides in this District, a substantial part of the events or omissions giving rise to the claims occurred in this District, and Meta's Commercial Terms of Service designate the United States District Court for the Northern District of California as an agreed forum for commercial claims not resolved in arbitration.

16. Intradistrict Assignment. Pursuant to Civil Local Rules 3-2(c) and 3-5(b), a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in San Mateo County, where Meta maintains its principal place of business.

## PARTIES

17. Plaintiff Veeleaf is a nonprofit corporation organized and existing under the laws of Mexico, with its principal place of business in Playa del Carmen, Quintana Roo, Mexico. Plaintiff

operates the Instagram account @veeleaforg as a professional/business account and, during the applicable Class Period, paid Meta to distribute sponsored posts.

18. Defendant Meta Platforms, Inc. is a Delaware corporation with its principal place of business in Menlo Park, California. Meta owns and operates the Facebook and Instagram platforms and sells advertising, including sponsored posts, to businesses and organizations throughout the world. Meta US enforces its Community Standards and Advertising Standards, and makes the ultimate decision to approve or deny any posts or suppress the reach of any account.[4]

19. Defendant Meta Platforms Ireland Limited is an Irish company with its principal place of business in Dublin, Ireland. Meta Ireland provides the Self-Serve Ad Interface for Veeleaf and is a wholly owned subsidiary of Meta US.

## FACTUAL ALLEGATIONS

### *A. Meta's Advertising Business*

20. Meta generates substantially all of its revenue from advertising. On Instagram, advertisers pay Meta to promote content as "sponsored posts" or "boosted posts," which Meta distributes beyond the advertiser's existing followers to a broader audience selected and paid for by the advertiser.

21. To advertise, a business or organization opens or converts to a professional/business account and places orders through Meta's self-serve advertising interfaces, such as Meta Ads Manager or the in-application "Boost" function. The advertiser specifies its budget, target audience, and objective, and pays Meta for the enhanced distribution.

### *B. The Advertising Agreement*

22. An advertiser's purchase of sponsored posts is governed by three documents, consisting of (i) Meta Commercial Terms of Service, (ii) Meta Self-Serve Advertising Terms, and

[4] Meta Platforms, Inc. SEC Form 10-K for fiscal year ended December 31, 2024, https://www.sec.gov/Archives/edgar/data/1326801/000132680125000017/meta-20241231.htm at p. 118 (noting Meta US was held accountable for "content reporting, content moderation decision appeals" overseas, "including in particular in Brazil, Russia, and other countries in Europe."

(iii) the Meta Terms of Service, (Exhibits A-C, collectively, the "Advertising Agreement"). Meta drafts these terms and requires advertisers to accept them as a condition of purchasing advertising.

23. The Advertising Agreement is governed by California law. *See* Ex. A, § 5.d.iii; Ex. B, § 16; and Ex. C, § 4.4. The contracting parties to the Advertising Agreement are Meta US, Meta Ireland, and individual advertisers. In particular, Meta US is a contracting party to both the Terms of Service and the Commercial Terms of Service (Exs. A and C). The Meta Self-Serve Ad Terms additionally provide that if an advertiser is located outside the US or Canada, the advertiser will pay Meta Ireland instead of Meta US for the sponsored and promoted posts. The Self-Serve Ad Terms incorporate by reference the Commercial Terms of Service, which, in turn also incorporate by reference the Terms of Service.

24. Section 1 of the Self-Serve Advertising Terms provides that, "[i]f we accept your Order, we will deliver your ads as inventory becomes available," and that, "when serving your ad, *we use best efforts to deliver the ads to the audience you specify or to achieve the outcome that you select*." (Emphasis added).

25. Meta charges advertisers for that delivery. In exchange for the advertiser's payment, Meta undertakes to distribute the advertiser's sponsored post to the paid-for audience using best efforts.

***C. Meta's Content Rules and Enforcement Representation***

26. Meta's Community Standards and Advertising Standards define the categories of content that Meta prohibits. Meta represents that it removes content only for violations of those standards and that it maintains a review-and-appeal process for its enforcement decisions.

27. Meta's Community Standards do not prohibit raising awareness about animal rights or documenting animal cruelty. To the contrary, the Community Standard titled "Coordinating Harm and Promoting Crime" permits users to "draw attention to harmful or criminal activity that they may witness or experience," so long as they do not advocate for or coordinate harm.[5]

[5] Meta, Community Standards, *Coordinating Harm and Promoting Crime*, https://transparency.meta.com/policies/community-standards/coordinating-harm-promoting-crime/.

28. Nor do Meta's Community Standards prohibit the depiction of peaceful protests or animal abuse. To the contrary, they declare that "[o]ur commitment to expression is paramount," and they identify giving people voice as the foremost value the Standards are designed to protect.[6]

29. To that end, Meta issued a public statement on January 7, 2025, titled "More Speech and Fewer Mistakes."[7] In it, Meta acknowledged that "[t]oo much harmless content gets censored" under its moderation systems, stated that its enforcement approach had gone too far, and announced that it would require a substantially higher degree of confidence before removing content in order to reduce the number of innocent posts and accounts it mistakenly took down.[8]

***D. Meta's Pre-Approval Process Before Sponsoring Posts***

30. Before Meta begins promoting any post, organizations like Veeleaf must first submit copies of the posts to Meta. Meta must clear the post and pre-approve it prior to its distribution. "Our ad review process starts automatically before ads begin running, and is typically completed within 24 hours."[9] "The ad review system on Meta technologies reviews ads for violations of the Advertising Standards, such as the policy on ads about social issues, elections or politics. This review process may include the specific components of an ad, such as images, video, text and targeting information as well as an ad's associated landing page or other destinations among other information."[10] Based on that preliminary review, the promoted post is either rejected or allowed to run.[11]

31. After Meta pre-approves a post and accepts payment for promoting it, "[a]ds remain subject to review and re-review at all times, and may be rejected or restricted for violation of our

---

[6] Meta, Community Standards, Introduction, https://transparency.meta.com/policies/community-standards/.

[7] Meta, More Speech and Fewer Mistakes (Jan. 7, 2025), https://about.fb.com/news/2025/01/meta-more-speech-fewer-mistakes/.

[8] *Id.*

[9] Meta, Introduction to the Advertising Standards, Ad Review Process, https://transparency.meta.com/policies/ad-standards/.

[10] Meta, How ads about social issues, elections or politics are reviewed, https://www.facebook.com/business/help/313752069181919?id=288762101909005.

[11] Meta, Introduction to the Advertising Standards, Ad Review Process, https://transparency.meta.com/policies/ad-standards/.

policies at any time."[12] Nevertheless, if an organization believes an "ad, Page or Business account was incorrectly rejected or restricted, you can request a review of the decision." [13]

***E. Meta Removes Veeleaf's Paid Protest Videos Without Any Stated Basis***

32. Among the content Plaintiff paid Meta to distribute were two videos (both originally posted in February 2025), criticizing a Mexican hotel's dolphin show. Both posts were *approved* by Meta US as complying with its policies *before* they were allowed to run. The first video documents a peaceful protest outside the Barceló Maya Grand hotel resort. Figures 1-A and 1-B. Demonstrators held banners stating "Close [the] Dolphin Prison" and addressed passing motorists with the message "A Day of Fun for You; A Lifetime of Misery for Them." *See id.*




**Figure 1-A**

[12] *Id.*

[13] *Id.*




**Figure 1-B**

33. The second video captures a live performance at the hotel showing a dolphin named Mincho being severely injured landing headfirst on concrete after performing an acrobatic leap. *See* Figures 2-A through 2-D. Spectators can be heard gasping in the video. *Id*.




**Figure 2-A**


**Figure 2-B**


**Figure 2-C**


**Figure 2-D**

34. The video made international news.[14] Thanks to Veeleaf and other animal rights groups shining a light on the hotel's barbaric exploitation of these animals and the media coverage that followed, the Mexican government stepped in to put an end to this practice. Mexico's environmental protection agency permanently shut down the hotel's dolphin show three months after the video surfaced. The investigation revealed the dolphinarium "forced [one dolphin] to perform while blind,"[15] and "Mincho, who suffered an injury on November 28, 2020 [was] put back to *work*[16] just two days later" "[d]espite a veterinarian's recommendation for two weeks of rest."[17]

35. Five months "after footage emerged of a dolphin leaping through the air and slamming into the ground… Mexico's Congress unanimously approved legislation banning

---

[14] *See, e.g.*, Daily Mail, Horrifying Moment Dolphin dies after leaping out of pool at Mexican Resort and smashing down into concrete floor, https://www.dailymail.com/news/article-14355343/Horrifying-moment-dolphin-dies-leaping-pool-Mexican-resort-smashing-concrete-floor.html; Mexico News Daily, Profepa shuts down dolphin show at Hotel Barceló in Riviera Maya, https://mexiconewsdaily.com/news/profepa-shuts-down-dolphin-show-hotel-barcelo-riviera-maya/.

[15] Dolphin Project, Authorities Shut Down Dolphinarium at Hotel Barceló https://www.dolphinproject.org/blog/authorities-shut-down-dolphinarium-hotel-barcelo/.

[16] Given that these dolphins are neither paid nor given any choice but to perform, a phrase like "involuntary servitude" is more appropriate than "work," which is commonly understood today as "fulfill[ing] duties for wages or salary." https://www.merriam-webster.com/dictionary/work.

[17] People for the Ethical Treatment of Animals, Dolphinarium at Barceló Maya Grand Resort Has Been Shut Down, https://www.peta.org/news/swim-with-dolphins-barcelo-maya-grand-resort/.

dolphin and marine mammal shows."[18] In signing the bill into law, Mexican President Claudia Sheinbaum said "We are against any violence, but animal abuse in particular is a reflection of what could later escalate in terms of violence."[19] Today, the act is referred to as "Mincho's Law."[20]

36. Veeleaf's sponsored video posts here were exactly the kind of quintessential free speech muckraking Meta promises users its platform is designed to foster. "Meta wants people to be able to talk openly about the issues that matter to them … even if some may disagree or find them objectionable."[21]

37. Even though Meta *pre-approved* the videos of both Veeleaf's protest and Mincho's fall *as complying with its policy*, on April 19, 2025—after the videos had been promoted for over two months—Meta abruptly removed both videos. Meta never provided an explanation for why the posts were removed. Meta nevertheless accepted Veeleaf's payments to promote these videos, without refunding Veeleaf any portion thereof after the videos were removed.

38. Meta never identified which Community Standard either video purportedly violated—because they *didn't*.

39. Take the video of Mincho's fall. Meta's "Coordinating Harm and Promoting Crime" Standard *expressly permits* content shared to raise awareness of and condemn harm to animals. At the time the video was removed on April 19, 2025, Meta's operative policy on Violent and Graphic Content *did not prohibit or age-gate* any videos of animals being injured.[22] Instead, the operative September 27, 2024 policy in effect at the time only included a warning screen if the video fit in one of the following narrow categories of videos:

---

[18] Lady Free Thinker, Victory! Mexico Passes Reform Banning Dolphin Shows and New Dolphinariums, https://ladyfreethinker.org/victory-mexico-passes-reform-banning-dolphin-shows-and-new-dolphinariums/.

[19] People for the Ethical Treatment of Animals, Is This the End of Dolphin Shows in Mexico? President Signs New Law, https://www.peta.org/news/dolphinariums-mexico/.

[20] The Ethicalist, Mexico Bans Dolphin Shows in Landmark Victory for Animal Welfare, https://theethicalist.com/mexico-bans-dolphin-shows/.

[21] Meta, Community Standards, Introduction, https://transparency.meta.com/policies/community-standards/.

[22] Meta, Violent and Graphic Content, https://transparency.meta.com/policies/community-standards/violent-graphic-content/.

a. "Any imagery of animals, still living or going from live to dead, – *depicting dismemberment, visible innards, burning or charring, or being boiled alive*."

b. "Any imagery of animals, when there *are visible innards or dismemberment of non-regenerating body parts, unless in the wild*."[23]

40. The video of Mincho's fall did not meet either of the standards. On May 14, 2025, shortly after Meta removed Veeleaf's video, it *amended* its policy to broaden its age-gating restriction to "Imagery of animals going from live to dead."[24] *See* Figure 3 (screenshot of Meta's website, showing the redlined changes to the policy).

**Imagery of animals**

~~Any~~ Imagery of animals, ~~still living or going from live to dead~~ living or dead, – depicting dismemberment, visible innards, burning or charring, or being boiled alive.

Imagery of animals going from live to dead.

Imagery of humans committing acts of brutality on living animals (e.g. kicking, drowning, or plucking feathers).

~~Any imagery of animals, when there are visible innards or dismemberment of non-regenerating body parts, unless in the wild.~~

**Figure 3**

41. Nor would the video of Mincho's fall justify removal *ex post facto* under Meta's *revised* Community Standards. While some mistakenly reported that Mincho had died from his fall, this was untrue, as Mexican authorities told the press that "the dolphin injured in the recent acrobatic stunt, Mincho, has been transferred to a facility where its condition is being monitored."[25] And *even if* Veeleaf's video depicted an animal's death, Meta's *revised* Community Standards state it would not warrant the post's *removal*, but simply "a warning screen so that people are aware the content may be sensitive."[26]

42. Even at the date of the filing of this Complaint, countless videos of Mincho's fall

---

[23] *Id.*

[24] *Id.*

[25] Mexico News Daily, Profepa shuts down dolphin show at Hotel Barceló in Riviera Maya, https://mexiconewsdaily.com/news/profepa-shuts-down-dolphin-show-hotel-barcelo-riviera-maya/.

[26] Meta, Violent and Graphic Content, https://transparency.meta.com/policies/community-standards/violent-graphic-content/.

are readily available on Meta's platforms without any warning or age-gating. Below are just a few that counsel was able to locate after five minutes of searching:

a. https://www.facebook.com/watch/?v=990741626287863;

b. https://www.instagram.com/reel/DFf-bh9y_nJ/?hl=en;

c. https://www.facebook.com/WorldAnimalProtectionNZ/posts/-dolphin-news-heartbreaking-footage-has-emerged-showing-a-dolphin-hitting-concre/1054942553342736/;

d. https://www.facebook.com/watch/?v=638456505239213;

e. https://www.instagram.com/reel/DFoLJxSSAk2/?hl=en.

43. The video of Veeleaf's protest likewise did not violate any Community Standard. The Community Standards contain no provision prohibiting depictions of peaceful protest, and they declare that Meta's "commitment to expression is paramount." As set forth above, Meta's "Coordinating Harm and Promoting Crime" Standard affirmatively permits content shared to raise awareness of or condemn harm to animals, and footage of demonstrators lawfully protesting outside a business is neither a threat, coordination of harm, nor any other prohibited category.

44. Nor did Meta's advertising policies prohibit the video. If Meta had deemed the video as falling within its Social Issues, Elections, and Politics policy, the video would have been "disapproved during ad review" and Meta would have required Plaintiff to resubmit the sponsored video with a verified 'Paid for by' disclaimer."[27]

45. Nor did Meta give Veeleaf an opportunity to appeal its content removal decisions for either video.

46. Because both these videos were sponsored posts, Meta reviewed and approved them *before* promoting them, and thereby determined—at the time it accepted Plaintiff's payment—that the videos complied with Meta's Advertising Standards and Community Standards. Meta's subsequent removal of these posts—for which Meta never identified any Community or

[27] Meta, How ads about social issues, elections or politics are reviewed, https://www.facebook.com/business/help/313752069181919?id=288762101909005.

Advertising Standard either video purportedly violated—cannot be reconciled with Meta's contractual promises.

### *F. Meta Suppresses Plaintiff's Paid Reach*

47. After Meta removed these videos, the delivered reach and engagement of Plaintiff's sponsored posts dropped precipitously and persistently, even though Plaintiff continued to pay Meta to distribute them.

48. Meta US notified Veeleaf in the app that its Account can't be shown to non-followers. *See* Figures 4-A and 4-B.




**Figure 4-A**




**Figure 4-B**

49. Meta, in soliciting more advertising payments, nevertheless *continued* to represent to Veeleaf that it could promote new posts, and that its posts would be displayed to others.

50. However, this was false and misleading. After Veeleaf's account became restricted, Veeleaf's viewership and reach metrics collapsed.

| Date of Post | Views | Reach | Interactions | Follows |
|---|---|---|---|---|
| Jan 10, 2025 | 120,195 | 79,402 | 11,393 | 1,059 |
| Feb 27, 2025 | 99,078 | 82,550 | 1,327 | 172 |
| Mar 3, 2025 | 127,644 | 104,958 | 1,900 | 139 |
| Apr 4, 2025 | 2,998,914 | 1,301,710 | 40,397 | 1045 |
| Apr 30, 2025 | 150,352 | 87,717 | 3,901 | 185 |
| May 15, 2025 | 31,018 | 22,990 | 816 | 20 |
| May 28, 2025 | 54,076 | 41,536 | 3,076 | 496 |
| Jun 25, 2025 | 16,180 | 11,576 | 869 | 4 |
| Jul 20, 2025 | 38,151 | 25,918 | 915 | 248 |
| Sep 30, 2025 | 28,654 | 20,103 | 1,209 | 57 |
| Oct 2, 2025 | 88,208 | 74,752 | 2,052 | 19 |
| Nov 11, 2025 | 49,601 | 32,200 | 1,540 | 9 |
| Dec 2, 2025 | 28,141 | 19,075 | 2,018 | 299 |
| Jan 14, 2026 | 20,351 | 13,815 | 897 | 23 |
| Jan 24, 2026 | 12,412 | 10,393 | 468 | 5 |

**Figure 5**

51. The magnitude, timing, and persistence of this decline are inconsistent with ordinary fluctuation and are consistent with Meta's suppression of the delivered reach of Plaintiff's paid posts. Meta did not disclose to Plaintiff that it had reduced the reach of Plaintiff's paid posts.

52. For example, prior to the April 19, 2025 removal of Veeleaf's videos, many of its other sponsored posts had done remarkably well. An April 4, 2025 reel had received nearly three million views, mostly from non-followers. *See* Figures 6-A and 6-B, next page.




**Figure 6-A**




**Figure 6-B**

53. In contrast, a May 15, 2025 sponsored post after the restrictions only received 31,018 views, and future videos received significantly less interactions. *See* Figures 7-A and 7-B, next page.




Figure 7-A




Figure 7-B

54. Moreover, an analysis of the median (not mean) viewership and reach of posts—done to avoid distortions caused by unusually large outliers (for certain viral posts)—show significant declines after the April 19, 2025 restriction. Reproduced below are 2025 Business Suite Exports.

| Metric | Before April 19, 2025 | On or After April 19, 2025 | Change |
|---|---|---|---|
| Posts analyzed | 36 | 86 | |
| Median reach per post | 43,028 | 18,031 | -58.1% |
| Median views per post | 58,060 | 20,370 | -64.9% |
| Median follows per post | 59.0 | 19.5 | -66.9% |

Figure 8




**Figure 9**

55. The reduced viewership and reach of these posts resulted in a significant reduction in the cost-effectiveness of Veeleaf's sponsored posts. For example, a recent promoted video only received a paltry 6,032 plays after spending 370.74 pesos to promote it.




**Figure 10-A**




**Figure 10-B**

56. Worse still, Meta also never afforded Veeleaf any opportunity to appeal these post removals. This, too, violated its own Ad Review Terms, which stated that if Veeleaf believed its "ad… was incorrectly rejected…, you can request a review of the decision."[28]

57. Based on Veeleaf's conversations with other similar advocacy organizations, it believes the account restrictions and suppressed reach it is experiencing is not an isolated error, but a common practice. Because these advocacy organizations frequently shine a light on unethical practices by for-profit companies in the hospitality, cosmetics, and food industries, they believe that some companies have made the business decision to—instead of altering their businesses practices to satisfy the wishes informed consumers—invest significant resources to send inauthentic complaints from both fake and real accounts to silence these advocacy organizations and keep the public in the dark.

58. Meta's removal and suppression of these paid posts violates the promises Meta makes to users the kind of speech its platform is designed to foster. "Meta wants people to be able to talk openly about the issues that matter to them … even if some may disagree or find them objectionable" because they hurt their bottom line. [29] Echoing these same sentiments, the Supreme Court noted that Veeleaf's commercial speech is essential to a properly functioning free market:

> So long as we preserve a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions. *It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed.* To this end, the free flow of commercial information is indispensable.

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 496–97 (1996) (emphasis added).

### *G. Meta's Liability Arises From Its Own Promises and Commercial Conduct, Not From the Publication of Third-Party Content*

59. Plaintiff does not seek to hold either Meta US or Meta Ireland liable as the publisher or speaker of any information created or provided by another party. Plaintiff seeks to hold Meta

[28] Meta, Introduction to the Advertising Standards, Ad Review Process, https://transparency.meta.com/policies/ad-standards/.

[29] Meta, Community Standards, Introduction, https://transparency.meta.com/policies/community-standards/.

liable for breaking its own promise to "*use best efforts to deliver the ads to the audience you specify or to achieve the outcome that you select*" when accepting payments to promote posts or ads. Self-Serve Ad Term, Ex. A.

60. Meta manifested its intent to be legally bound by the promises in the Advertising Agreement, including its promise to use best efforts to deliver the sponsored posts advertisers pay Meta to distribute. Meta's duty to keep those promises springs from the Advertising Agreement, not from Meta's status as a publisher. *See Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 742–43 (9th Cir. 2024).

61. Meta could have satisfied its duties to Plaintiff without monitoring, editing, or removing any content provided by a third party. Meta Ireland could have delivered the sponsored posts it was paid to deliver, and Meta US could have refrained from suppressing the reach of paid posts, refrained from removing the pre-approved posts without any valid basis—none of which require any judgment about third-party speech.

62. The content Meta US removed and suppressed was Plaintiff's own paid content, which Meta itself had previously reviewed and approved prior to accepting payment. Meta's wrong was its commercial conduct toward its paying customer: accepting payment to distribute Plaintiff's content while simultaneously removing and suppressing that content, misrepresenting the reasons for doing so, and accepting payment for but suppressing subsequent paid content.

63. Because Plaintiff's claims arise from Meta's own promises and commercial conduct, and do not treat Meta as the publisher or speaker of third-party content, Section 230(c)(1) of the Communications Decency Act, 47 U.S.C. § 230(c)(1), does not bar them. *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009); *Calise*, 103 F.4th 732; *Est. of Bride v. Yolo Techs., Inc.*, 112 F.4th 1168 (9th Cir. 2024); *Doe 1 v. Twitter, Inc.*, 148 F.4th 635 (9th Cir. 2025).

## CLASS ALLEGATIONS

64. Class Definition. Plaintiff seeks to represent a Class defined as follows:

> **Class**: All business or advertiser accounts on Facebook or Instagram that, during the applicable Class Period, paid Meta to distribute one or more sponsored posts and either (a) had a paid post removed without a bona fide violation of Meta's Community Standards or

Advertising Standards, (b) after having a post reported or removed, experienced a reduction in the delivered reach of subsequent paid posts.

65. Excluded from the Class are Defendants; Defendants' parents, subsidiaries, affiliates, officers, and directors; the judicial officers presiding over this action and their chambers staff; and any entity in which Defendants have a controlling interest.

66. Numerosity. Members of the Class are so numerous that their individual joinder is impracticable. Members of the Class likely number in the thousands or more. Their identities can be ascertained from Defendants' own records.

67. Commonality. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members. These common questions include, without limitation: (a) whether the Advertising Agreement obligated Meta to use best efforts to deliver paid posts to the audiences advertisers paid to reach; (b) whether Meta removed paid posts absent any bona fide violation of its content rules; (c) whether Meta suppressed the delivered reach of paid posts following content reports or removals; (d) whether Meta's conduct breached the Advertising Agreement; (e) whether Meta's conduct breached the implied covenant of good faith and fair dealing; and (f) the appropriate measure of damages and restitution.

68. Typicality. Plaintiff's claims are typical of the claims of the Class. Plaintiff and the members of the Class paid Meta to distribute sponsored posts and were injured by the same course of conduct—the removal of paid posts on false pretenses and the suppression of the reach of paid posts.

69. Adequacy. Plaintiff is an adequate representative of the Class because its interests do not conflict with the interests of the members it seeks to represent, and it has retained counsel competent and experienced in complex and class action litigation. Plaintiff and its counsel will fairly and adequately protect the interests of the Class.

70. Rule 23(b)(2). Meta has acted and refused to act on grounds that apply generally to the Class, so that final injunctive and corresponding declaratory relief is appropriate respecting the Class as a whole.

71. Rule 23(b)(3). Common questions predominate over any individual questions, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Meta's liability turns on standardized contract terms Meta drafted and on Meta's own centralized content-enforcement and ad-delivery systems, and the injuries can be established and measured using Meta's own account-level records and reach data. Individualized litigation would be impracticable given the modest per-member amounts at stake relative to the cost of suit.

## COUNT I

### Breach of Contract

### (On Behalf of the Class Against Both Defendants)

72. Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

73. Plaintiff and the members of the Class entered into the Advertising Agreement with Meta US. Where Plaintiff and members of the Class reside or are located outside the United States or Canada, Meta Ireland is an additional contracting party to the Advertising Agreement. Meta US is a contracting party to both the Terms of Service and the Commercial Terms of Service (Exs. A and C). The Meta Self-Serve Ad Terms additionally provide that if an advertiser is located outside the US or Canada, Meta Ireland is a contracting party to the Self-Serve Ad Terms, and receives payment for the sponsored and promoted posts. The Self-Serve Ad Terms incorporate by reference the Commercial Terms of Service, which, in turn, also incorporate by reference the Terms of Service.

74. All of the documents state the Advertising Agreement is governed by California law. *See* Ex. A, § 5.d.iii; Ex. B, § 16; and Ex. C, § 4.4.

75. Plaintiff and the members of the Class performed all conditions, covenants, and obligations required of them under the Advertising Agreement, including paying Meta for the sponsored posts they ordered. From April 19, 2025 to March 15, 2026, Veeleaf paid Meta $104,403.50 MXN ($6,014.77 USD) to promote its posts. And from January 1, 2023 to March 15, 2026, Veeleaf has paid Meta $930,376.75 MXN ($53,599.90 USD) to promote its posts.

76. Meta breached the Advertising Agreement, including Section 1 of the Self-Serve Advertising Terms, by failing to deliver the sponsored posts it was paid to deliver and by failing to use its best efforts to deliver those posts to the audiences advertisers paid to reach—including by suppressing the delivered reach of paid posts, and removing paid posts (absent any bona fide violation of Meta's content rules). Meta US or Meta Ireland cannot accept payments from advertisers to use its "best efforts to deliver posts" to audiences while Meta US *simultaneously suppresses the reach of those posts* or removes those posts without a valid basis. Meta either needs to pick one or the other, but it cannot have it both ways.

77. Plaintiff and members of the Class were never given any refunds for their payments spent after Meta US suppressed the reach of their posts, or removed their posts without any valid basis.

78. Section 230(c)(1) of the Communications Decency Act does not bar this claim. Meta's duty arises from its own promises in the Advertising Agreement, and Plaintiff seeks to hold Meta liable as the counterparty to a contract—as a promisor that has breached—not as the publisher or speaker of third-party content. *See Calise*, 103 F.4th at 742–43.

79. As a direct and proximate result of Meta's breaches, Plaintiff and the members of the Class have been damaged, including in the amounts they paid for sponsored posts that Meta removed or failed to deliver as promised and in the diminished value of the distribution they actually received.

80. Plaintiff and the members of the Class seek damages, restitution, and injunctive relief.

81. Plaintiff and Class members have standing to pursue injunctive relief. Plaintiff and Class members would like to continue purchasing sponsored posts from Defendants, so long as they can be assured that Meta US will not thereafter suppress their reach or otherwise remove their posts without a valid stated basis.

**COUNT II**

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

**(On Behalf of the Class Against Both Defendants)**

82. Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

83. Every contract governed by California law contains an implied covenant of good faith and fair dealing, which prohibits each party from doing anything that will deprive the other of the benefits of the agreement. As noted, the Advertising Agreement is governed by California law. *See* Ex. A, § 5.d.iii; Ex. B, § 16; and Ex. C, § 4.4.

84. To the extent the Advertising Agreement vested Meta US with discretion—including discretion to review and remove ads and to determine the delivery and placement of paid posts—Meta US was required to exercise that discretion in good faith, honestly, and consistent with the parties' reasonable expectations, and not arbitrarily, pretextually, or in a manner that frustrates the central purpose of the contract.

85. Meta US and Ireland breached the implied covenant of good faith and fair dealing by exercising their discretion in bad faith, including by: (a) removing Plaintiff's and Class members' paid posts on invalid grounds that Meta knew or should have known were false given it never provided any basis for their removal; (b) rejecting appeals of those removals without any genuine review; and (c) covertly suppressing the delivered reach of paid posts while continuing to accept payment for them—thereby depriving Plaintiff and the Class of the central benefit of the Advertising Agreement, namely the delivery of their paid content to the audiences they paid to reach.

86. Section 230(c)(1) does not bar this claim, which arises from Meta's own contractual undertaking and its bad-faith exercise of the discretion that undertaking conferred, and does not seek to treat Meta as the publisher or speaker of third-party content. *See Calise*, 103 F.4th at 743.

87. As a direct and proximate result of Meta's breach of the implied covenant, Plaintiff and the members of the Class have been damaged.

88. Plaintiff and the members of the Class seek damages, restitution, and injunctive relief.

89. Plaintiff and Class members have standing to pursue injunctive relief. Plaintiff and Class members would like to continue purchasing sponsored posts from Defendants, so long as they can be assured that Meta US will not thereafter suppress their reach or otherwise remove their posts without a valid stated basis.

**COUNT III**

**Violation of California's Unfair Competition Law**

**(Cal. Bus. & Prof. Code § 17200, et seq.)**

**(On Behalf of the Class Against Meta US)**

90. Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

91. California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Each of the three prongs is independently actionable.

92. Plaintiff and the Class members have standing under the UCL because they paid Meta Ireland for sponsored posts and lost money or property as a result of Meta US's conduct. Cal. Bus. & Prof. Code § 17204.

93. Unlawful. Meta US's conduct is unlawful. Meta US's breaches of the Advertising Agreement and of the implied covenant of good faith and fair dealing, as alleged above, constitute predicate unlawful business acts and practices under the UCL.

94. Unfair. Meta US's conduct is unfair. Allowing a subsidiary to accept payment to distribute an advertiser's sponsored posts while Meta US simultaneously removing those posts without a bona fide basis and suppressing the reach of an advertiser's paid content offends established public policy and is immoral, unethical, oppressive, and unscrupulous. The harm this practice causes to advertisers substantially outweighs any benefit, and advertisers could not reasonably have avoided it.

95. Fraudulent. Meta US's conduct is fraudulent. Meta represented that it would use best efforts to deliver the sponsored posts advertisers paid it to distribute and that it removes content only for bona fide violations of its stated policies, while in fact removing paid content on pretextual grounds and suppressing the reach of paid posts. These representations and omissions were likely to deceive reasonable advertisers, and Plaintiff and the Class members relied on them in paying Meta to distribute their content.

96. Section 230(c)(1) does not bar this claim. To the extent the claim borrows Meta's breach of contract as a predicate, the underlying wrong is Meta's breach of its own promise, not the publication of third-party content. And to the extent the claim rests on Meta's misrepresentations, those misrepresentations concern Meta's own paid service and are actionable independent of Meta's status as a publisher. *See Calise*, 103 F.4th at 743; *Est. of Bride*, 112 F.4th at 1176–77.

97. As a result of Meta's unlawful, unfair, and fraudulent conduct, Plaintiff and the Class members lost money and property and are entitled to restitution and to injunctive relief under Cal. Bus. & Prof. Code § 17203.

98. Plaintiff and Class members have standing to pursue injunctive relief. Plaintiff and Class members would like to continue purchasing sponsored posts from Defendants, so long as they can be assured that Meta US will not thereafter suppress their reach or otherwise remove their posts without a valid stated basis.

99. Plaintiff and Class members lack an adequate remedy at law for this claim. The scope of actionable misconduct under the unfair prong of the UCL is broader than the other causes of action asserted in this Complaint and legal claims for damages are not equally certain as restitution because claims under the UCL and unjust enrichment entail fewer elements.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the members of the Class, prays for judgment as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class, and appointing Plaintiff's counsel as Class Counsel;

B. For an order declaring that Meta's conduct violates its contractual obligations and the implied covenant of good faith and fair dealing described herein;

C. For an award of damages, restitution, and/or disgorgement in an amount to be proven at trial, including restitution under California Business & Professions Code § 17203;

D. For injunctive relief, including an order enjoining Meta from removing or suppressing the delivered reach of paid posts absent a bona fide, good-faith determination that the content violates Meta's stated policies, requiring Meta to provide good-faith review of enforcement decisions and a functioning appeal process, and requiring Meta to disclose reductions it makes to the reach of paid content;

E. For pre-judgment and post-judgment interest as permitted by law;

F. For an award of Plaintiff's and the Class's reasonable attorneys' fees, expenses, and costs of suit to the extent permitted by contract or law; and

G. For such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated: July 23, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: *_/s/ Stefan Bogdanovich_*
Stefan Bogdanovich

L. Timothy Fisher (State Bar No. 191626)
Daniel S. Guerra (State Bar No. 267559)
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., 9th Floor

Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
dguerra@bursor.com
sbogdanovich@bursor.com

*Attorneys for Plaintiff and the Putative Class*